**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **MARYANN BROTHERS, et al.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **NASHVILLE 5G HOLDINGS, LLC, et al.,** | |
| **Defendants.** | |
| **and** | **Case No.: 3:08-1166** |
| | **Judge Haynes** |
| **TEAIRA KING, et al.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **NASHVILLE 5G HOLDINGS, LLC, et al.,** | |
| **Defendants.** | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AS TO PLAINTIFF STEPHEN CARDINAL**

Pursuant to Fed.R.Civ.P. 56(b), Local Rules 7.01 and 56.01, and the Court's

Scheduling Order, the Defendants, Nashville 5G Holdings, LLC ("N5GH" or

"Company"), John R. Isaac, Jr. ("Isaac"), and William McKechnie ("McKechnie"), by

counsel, hereby submit the following memorandum of law in support of Defendants'

Motion for Summary Judgment as to Plaintiff Stephen Cardinal ("Cardinal").

**I.      INTRODUCTION**

This case is a collection of nine separate plaintiffs, eight of whom are primarily

proceeding on the theory that a Company manager, John Isaac, used racial slurs in the

workplace. Unlike those of the other eight plaintiffs, the case of the ninth plaintiff, Stephen Cardinal, does not pertain to any alleged discriminatory comments made by Isaac. Rather, Cardinal (who is Caucasian) asserts that he was forced to resign in retaliation for his opposition to an alleged plan by the Company to engage in discriminatory hiring practices. Accordingly, Cardinal asserts that Defendants have thereby violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII"), 42 U.S.C. § 1981("Section 1981"), the Tennessee Human Rights Act Tenn. Code § 4-21-101, *et seq.* ("THRA") and Tennessee common law.

On the basis of substantial discovery conducted by the parties, it is now apparent that there exists no genuine issue of material fact associated with Cardinal's claims. Moreover, Cardinal has not produced evidence to establish that he suffered disparate treatment, retaliation or a hostile environment based on race, or any other actionable conduct on the part of Defendants. Accordingly, Defendants respectfully submit that they are entitled to summary judgment as a matter of law pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

## II.    STATEMENT OF FACTS

### A.    Background of Nashville 5G Holdings, LLC

N5GH is a franchisee of Five Guys Enterprises, Inc., that specializes in serving freshly prepared hamburgers and hand-cut French fries in a casual dining atmosphere. Statement of Undisputed Material Fact at ¶ 2 (hereinafter, "SOF"). McKechnie, who resides in Charlottesville, Virginia, is the managing member of N5GH. SOF ¶¶ 1, 3. Currently, N5GH operates three Five Guys restaurants in the Nashville area. SOF ¶ 4. However, prior to November 2008, N5GH operated only two restaurants: the Green Hills

store, which opened on or about November 23, 2007, and the West End store, which opened on or about January 21, 2008.  SOF ¶ 4.

### B.     Cardinal Hired to Serve as Area Manager

Cardinal was hired by McKechnie to serve as the Area Manager of N5GH in September 2007. SOF ¶ 5. As the Area Manager, Cardinal reported directly to McKechnie and was responsible for the day-to-day operational activities of the N5GH restaurants, including supervising each restaurant's General Manager (store manager). SOF ¶¶ 6, 7.

### C.     McKechnie's Hiring Profile and Use of Recruiting Firm

During McKechnie's search for qualified candidates for various management positions within the fledgling company, including the Area Manager position, McKechnie engaged Martin and Associates, a professional restaurant staffing and recruiting firm located in Atlanta, Georgia. SOF ¶ 38.  McKechnie first learned about Martin and Associates recruiting services through another Five Guys' franchisee, Monument Restaurant Group ("Monument"), through Monument's then Area Manager, Kevin Nelson. SOF ¶ 39-40. Monument had previously used Martin and Associates to locate management personnel for their Five Guys' restaurants in the Atlanta, Georgia area. McKechnie was impressed with Monument's operations and managerial staff, which included Kevin Nelson. SOF ¶ 41-46.

The hiring model, or "profile" used by Monument and Martin and Associates was based on obtaining management personnel that were highly motivated, who possessed high integrity and honesty, who were "hands on" working managers, who were proven leaders who could maximize profit, who possessed the ability to develop subordinate

managers, and who possessed a polished professional image. SOF ¶ 42. The hiring model used by Kevin Nelson and Monument was commonly referred to as a hiring "profile" or "candidate profile" within Monument and Martin and Associates. SOF ¶ 43.

Thereafter, Martin and Associates, through recruiter Jason Bonesteel, assisted N5GH in locating qualified candidates for N5GH's management positions. SOF ¶ 45. Through discussions between Bonesteel and McKechnie, McKechnie instructed Martin and Associates to locate management candidates that fit Kevin Nelson's and Monument's "profile." SOF ¶ 46. Race, sex, and/or age were never a factor in the "profile" used by N5GH and Martin and Associates to identify and select candidates for employment with N5GH. SOF ¶ 47. Indeed, Bonesteel never had any communications whatsoever with McKechnie regarding a candidate's race, age or sex, nor did McKechnie ever mention a candidate's race, sex or age to Bonesteel. SOF ¶¶ 48-49.

Martin and Associates identified Cardinal as a candidate for the Area Manager position with N5GH. After successful interviews with McKechnie, Cardinal was ultimately hired as the Area Manager in September 2007. SOF ¶ 5. Subsequently, McKechnie and Cardinal began the search for candidates for the General Manager position of the West End store, which was scheduled to open in January 2008. Several candidates were identified by Martin and Associates for the General Manager position. After several candidates were interviewed, McKechnie ultimately hired Eleanor Tyson to serve as the General Manager of the West End store in December 2007. SOF ¶ 52-56. Eleanor Tyson, an African-American female, was the best candidate for the position, and was selected over several other candidates, all of whom were Caucasian males. SOF ¶ 53.

Since Eleanor Tyson's hire on December 26, 2007, she has continuously been employed with N5GH as a General Manager. SOF ¶ 57.

> **D.** **Need to Reduce Labor Hours After the Green Hills and West End Stores Sales Decline After Initial Grand Opening Period**

McKechnie and Cardinal were both aware that during the initial start-up of each restaurant, especially in a new market, N5GH would need to initially hire more employees than it would eventually need. Cardinal testified that

> [Y]ou know, so at this point now, now we're starting to cut labor . . . I'm pushing John [Isaac, the General Manager of the Green Hills store] to hit his labor targets . . . . So instead of when we first opened and we had cashiers standing there and people opening doors and all that stuff, now we're at -- you know, you're between the hours of, let's say 2:00 and 5:00. You're sitting there with probably no more than three people on the clock is what you should -- should have.

Cardinal Dep. 118:19 – 119:3. Management needed to "either increase sales or reduce the number of hours to – get that [labor] percentage where you need it to be." Cardinal Dep. 121:14-24. Moreover, McKechnie explained that:

> in the opening stages of a new market you want to make sure that you have plenty people on board to be able to create the quality of the product that you're looking to provide and take care of the people that coming in your door. [T]here is a certain . . . upfront investment, if you will, in labor. You want to make sure that you have got enough people on deck to take care of folks. [T]hose [labor] rates would typically be higher in a new marketplace in a new restaurant than they would be later on. And [Cardinal and McKechnie] discussed, you know, quite openly the fact that labor percentages were higher than they should have been at both Green Hills and West End.
> * * *
> West End was a good start, but we had come off our honeymoon period, if you will, fairly quickly. Within a couple or three months we were looking at school winding down. [The West End store] is on West End Avenue right across from Vanderbilt. Certainly there was a concern that we were losing a big part of our customer base there.
> * * *
> So clearly we were concerned about sales, and when you're concerned about sales, you're also concerned about the number of people that you

have got on the floor. And when I had discussions with Stephen [Cardinal], we would talk about the fact that labor percentages were too high . . . .

McKechnie Dep. 150:2 – 152:4.

In fact, after Cardinal promoted Isaac from Assistant Manager to General Manager of the Green Hills store in January 2008, Cardinal had been pushing Isaac to cut labor and hit his labor targets. Cardinal Dep. 124:7-15.

### E.  May 1, 2008 Meeting Between McKechnie and Cardinal

On April 30, 2008, McKechnie traveled from his home in Charlottesville, Virginia to Nashville for the purpose of visiting N5GH operations. On Thursday, May 1, 2008, McKechnie met with Cardinal. During the meeting on May 1, Cardinal advised McKechnie that he was not going to be available to meet with McKechnie the next day, Friday, May 2, because Cardinal was attending a closing on his new home in Antioch, Tennessee. Cardinal had previously told McKechnie that he was planning to move to Antioch in order to be closer to the West End and Green Hills stores.[1] Indeed, Cardinal had supported his decision to move from Portland to Antioch to McKechnie by emphasizing that Antioch was closer to the Company's existing stores and the Company's plans to open stores in Brentwood and Cool Springs. McKechnie Dep. 187:8-

---

[1] In his deposition, Cardinal acknowledged that it would be better for an Area Manager to be centrally located to the stores that manager actually managed. Cardinal Dep. 26:10 – 28:13.
Q: But in general, I mean, you mentioned this before in one of your other jobs, it's -- it's a better situation for you -- for the manager or director of operations to live in close proximity to the sore that he or she is managing, is that fair?
A: It's fair.
Cardinal Dep. 148:24 – 149:4. However, the actual location of where Cardinal lived was not an issue to McKechnie, so long as he was able to handle his responsibilities. McKechnie testified "that it's not as much the fact where you live that matters.

17.  However, McKechnie never told Cardinal that he had a problem with Cardinal living in Portland. McKechnie Dep. 187:18-20.

Also during the Thursday, May 1, 2008 meeting, Cardinal and McKechnie talked about reducing labor costs and "under performing managers." Cardinal Dep. 151:18 – 152:2; 155:19-156:11. Cardinal also testified that he and McKechnie talked about "get[ting] rid of people that weren't [] performing" and had a discussion about the "model" that "was learned through Monument Restaurants, through Kevin Nelson, through Jason Bonesteel." Cardinal Dep. 152:4-13. However, Cardinal testified that his understanding of the "model" was "pretty much" "25 to 35-year old males that can come in, that can do all the prep, you don't have to have other people in there." Cardinal Dep. 152:4-13. Cardinal further testified that McKechnie "had reservations, I want to say, about MaryAnn, Jim, and the color profile at West End." Cardinal Dep. 152:12-13.

While it is true that McKechnie, according to the Monument/Kevin Nelson/Jason Bonesteel "model," wanted managers that were "hands on" productive managers, there was never a discussion about "color profile," age or sex, nor was age, sex, or race ever a component of the "model". SOF ¶ 37. Specifically, Cardinal testified as follows:

> Q: [W]hat specifically did [McKechnie] say about the – let's start with the hiring of individuals based on their age and whether they were male or female.
>
> A: [W]hat I **feel** like [McKechnie] was **alluding** to was if we - - if we stick with the profile we would get a better productive manager which would make our - - you know, which would make everything [labor percentages] come in line.  At this time [McKechnie] was hitting me with labor grids that were at 15 percent, 16 percent overall for just hourly employees. (emphasis added).

_____

[Although] where you live in terms of how you perform your job matters . . . . You have to be centrally located to where your stores are."  McKechnie Dep. 184:20 – 185:4.

Q:  Well, I thought you told me earlier and -- and that your testimony was that you were never instructed about any hiring based on race or sex or age.

A.  I wasn't. What I mean by that is like--he's like he's like, you know, if we would stick with the profile we would get a better productive employee, not that we need to or not that we have to, but if we look at this profile it's proven that it works within the Five Guys Enterprises system, so up until that point, which was Thursday night, two days before I was forced to resign, I never had that conversation with [McKechnie] until then.

Cardinal Dep. 152:14-153:11. Cardinal continued to elaborate as to what his understanding of the "profile" was. Cardinal stated that the profile meant "male, Hispanic" and whether

[c]an they work, can they come in and do what's expected of a manager to open a Five Guys.  You know, could they do all of that. There's tons of prep, prep, prep, prep to do in the morning.  Can they come in, get their day started, be self actuzed [sic] and do all of these things that we're going to require of them . . . .

In response, Cardinal was asked "if you're African American that means you're not in the profile," to which Cardinal responded, "I don't know.  I didn't make the profile."

Cardinal Dep. 153:25 – 154:14.  Notwithstanding Cardinal's assumption or personal understanding of the profile as meaning a Hispanic manager in his or mid 20s to mid 30s, at no point in time had there ever been an Hispanic Area Manager or General Manager – indeed, Cardinal was not an Hispanic under the age of 30, nor was Eleanor Tyson. Subsequently, after acknowledging that James Newman (a Caucasian) was one of the managers that McKechnie and Cardinal discussed as being an underperforming manager

that potentially didn't fit the "profile" of a "working manager," Cardinal admitted that race was not a factor in the "profile."[2]

Cardinal also testified that during the May 1, 2008 meeting with McKechnie, McKechnie stated that "we're too dark at West End," that McKechnie wanted to know why the West End store was 90% African American, and that McKechnie wanted Cardinal to "lighten up the place" to "get a balanced mix." Cardinal Dep. 152-165. McKechnie denies making these comments. Cardinal testified that prior to the May 1, 2008 meeting, Cardinal never had any indication from McKechnie that Cardinal should make any kind of hiring decision involving race. Cardinal Dep. 178:6-24.

**F.      May 3, 2008 Meeting Between McKechnie and Cardinal**

The next day, Friday, May 2, 2008, the date that Cardinal had told McKechnie that he was closing on the home in Antioch, McKechnie learned from John Isaac, who at the time was the General Manager of the Green Hills store, that Cardinal was not in fact purchasing a house in Antioch as Cardinal had told McKechnie. McKechnie Dep. 184:6-11. At that point in time, McKechnie was concerned that one of his managers (either Cardinal or Isaac) was lying to him. McKechnie thought it was "extremely odd" that Cardinal would tell him that he's buying a house in Antioch when in fact that was not the case. McKechnie Dep. 185:12-15. At no point had McKechnie ever told Cardinal to

---

[2] Q: And [McKechnie] identified Jim Newman as one of the problem employees in this same conversation?
A: Absolutely. Yes.
Q: So doesn't that indicate to you that whether you're in one racial group or another is not part of the profile, whatever else may be, whether it's age, male, female, you know, type of worker, et cetera, that race is not a component of this profile?
A: I mean, race wouldn't be in that generalization, no. I mean it--no , no, it--no, it--no it wouldn't be.
Cardinal Dep. 156:12-22.

move to Antioch.  For McKechnie, the troubling issue was not that Cardinal might not be moving to Antioch, but rather, that Cardinal was possibly lying to McKechnie about it.

On Saturday, May 3, 2008, McKechnie confronted Cardinal about the information he had learned from Isaac – that Cardinal was not in fact buying the house in Antioch. McKechnie told Cardinal that it was McKechnie's understanding that Cardinal was not buying a house in Antioch, but instead, was buying a house in Portland.  In response, Cardinal again lied to McKechnie and stated that he was indeed moving to Antioch. McKechnie asked Cardinal as to why this would be something Isaac would lie about. Again, Cardinal told McKechnie that he had settled on the Antioch house the previous day, on Friday, May 2.

McKechnie was perplexed as to why his Area Manager (or one of his General Managers) would lie about such an issue.  McKechnie "didn't really care where the guy lived, but . . . was just trying to think why is it that anybody involved in this discussion would lie about it."  McKechnie Dep. 189:10-14.  Accordingly, McKechnie stated to Cardinal, "you know what, this is really making me uncomfortable.  I want this to end . . . I don't want to have any questions anymore."  To McKechnie, this was "a major issue of honesty" and McKechnie requested that Cardinal provide him with copies of the settlement documents from the Antioch house closing that occurred the day prior.  It was McKechnie's intention that Cardinal would be able to provide evidence of the closing so that he and Cardinal could "settle this and . . . move on."  McKechnie Dep. 189:9-190:25. Cardinal agreed that he would retrieve the settlement documents and return to the store in a couple of hours.

When Cardinal returned, he was not carrying settlement documents; instead, he was carrying a manila envelope. Cardinal told McKechnie that his wife had the entire settlement package – that the documents were not at his house. In response, McKechnie stated,

> Stephen, this is getting -- this is getting -- this is getting really tough. I need -- show me some other indication that that's where you were yesterday. I need some other proof. I mean, is there -- it was Saturday so we couldn't call the financing company and have them confirm or I didn't -- I said, "I'm sorry to make such a big deal out of this, but it is what it is and I don't feel comfortable with this fact. You were gone for two, two and a half hours. You know, you come back, you don't have anything that I can see. How can we resolve this issue?" And at that moment he slapped his hand on the table, he slapped his hand on the envelope, and he said "I'm sorry" -- well, he had maintained -- he continued to maintain, but then he slapped his hand, and he said, "Look, I'm sorry. I lied. I realize that I have let you down. I realize that I have disappointed you, I'm sure. Here are the keys to my car. Here is my credit card. Here are the keys to the stores," et cetera, et cetera.

McKechnie Dep. 192:7 – 193:2.

McKechnie responded that he had wished Cardinal had told the truth. When Cardinal confessed to lying, Cardinal resigned and apologized that he had broken McKechnie's trust. McKechnie Dep. 197:23 – 198:14.

Cardinal's recollection of the May 3, 2008 meeting is substantially consistent with McKechnie's deposition testimony. Cardinal testified that "basically, I had told [McKechnie] that I was going to buy a house [in] Antioch . . . and I was actually looking at two houses, one in Portland, one in Antioch, Tennessee, and I was not truthful [with McKechnie] about that . . . ."

Q: [W]hat did you tell [McKechnie] that was not truthful?

A: [I] told [McKechnie] I was going to buy the house [in] Antioch when we had switched our mind and was going to buy the house in Portland.

Q: And when [McKechnie] was in town did you continue to tell him that you'd actually purchased the home in Antioch?

A: I told him on Thursday I did and then on Saturday I told him I didn't.

* * *

Q: Do you recall being asked to go to your home and get some evidence that what you were saying was true about having purchased a home in Antioch?

A: Yes.

Q: Okay. Do you remember what day that was?

A: I -- I think it was on a Saturday.

Q: Okay. And did you return after that trip and say to [McKechnie] that actually your wife had the settlement statement and so that's why you didn't have it?

A: No. I--came back in--I think I actually just drove around and thought about, you know, lying to Bill. I--it wasn't a--you know, it--it wasn't something that I'm proud of today or I was proud of then. And I walked in. He said, man, I just had the best fries I've ever--I've ever had in my life. He said, what you got for me? I said, I got nothing for you. I said I lied to you. I'm sorry. I bought the house in Portland. We're going to close on Monday. He said, I thought you went to close on it on Friday. I said, we went through a dry run but the financing was not there because it was after time, so the financing was going to be there on that Monday.

Q: And at that point did you have already collected in a bag your keys and--and other items that belonged to the company?

A: I believe I did. I believe I got some stuff out of the car, uh-huh.

Cardinal Dep. 145:11-147:2.

When asked why he didn't simply tell McKechnie the truth about moving to

Portland instead of Antioch, Cardinal stated that "because I had basically lied to Bill,

because I did, okay, you know, [I] felt like I should--you know, I--I--I--I felt like I

should--you know, I--you know, I should stick--I should stick with--with that." Cardinal Dep. 150:9-12.

## III.     ARGUMENT

### A.     Summary Judgment Principles

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." *Ford v. General Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002).  A party opposing summary judgment may not rest upon mere allegations or denials in the pleadings, but must introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial. *Id*. at 552.  "There mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must draw inferences in favor of the non-moving party, it is not required to draw every conceivable inference from the record – only those that are reasonable. *Ford*, 305 F.3d at 551.  Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) and Fed.R.Civ.P. 56(e)).  Only factual disputes that might affect the outcome of the suit are material when ruling on a summary judgment motion. *Anderson*, 477 U.S. at 247-48.  The nonmovant "must adduce more than a scintilla of evidence to overcome

the motion [and] . . . must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Street v. J.C. Bradford Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

When weighed against the applicable law and undisputed facts in this case, Mr. Cardinal manifestly has failed to produce evidence sufficient to meet his burden.

### B.      Retaliation – Applicable Law

To establish a *prima facie* case of unlawful retaliation under Title VII, a plaintiff must demonstrate that (1) he engaged in activity that Title VII protects; (2) the exercise of protected rights was known to the defendant; (3) the defendant thereafter took an employment action against him that a reasonable employee would have found to be materially adverse; and (4) a causal connection existed between the protected activity and the adverse employment action. *Ellsworth v. Pot Luck Enterprises, Inc.* 624 F.Supp.2d 868, 881 (M.D. Tenn. 2009); *see also Randolph v. Ohio Dep't. of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "Although temporal proximity between protected conduct and an adverse employment action may "be coupled with other indicia of retaliatory conduct" to prove causation, temporal proximity by itself, "is insufficient to find a causal connection." *Ellsworth*, 624 F.Supp.2d at 882; *Randolph*, 453 F.3d at 737. Claims brought under Section 1981 and the THRA are analyzed in the same fashion as claims brought under Title VII, *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001), so this is the proper analysis for Cardinal's retaliation claim under all applicable statutes.

**C.  Cardinal Cannot Establish a Case of Retaliation**

In light of the undisputed facts, Mr. Cardinal is unable to establish any of the following:  (1) that he engaged in protected activity that was known to any Defendant; (2) that he suffered any adverse action (material or otherwise); or (3) that there was any causal connection between his alleged protected activity and the alleged adverse employment action by the Defendants.

*1.  There Was No Protected Activity*

As an initial matter, it is clear from Mr. Cardinal's deposition testimony that the one incident that Mr. Cardinal is proposing as his alleged protected activity was his conversation with Bill McKechnie on the evening of May 1, 2008.[3]  Not only is this the only time Mr. Cardinal ever even hints at having opposed unlawful discrimination, but Mr. Cardinal's testimony is very clear that, prior to the May 1, 2008 meeting, he never had any indication from Mr. McKechnie that he should make any kind of hiring decision involving race. Cardinal Dep. 178:6-24.

Mr. Cardinal's account of the May 1, 2008 meeting is rather disjointed, but a few things are clear.  First, although Mr. Cardinal's understanding of the Five Guys working manager hiring model differs slightly from the description provided by Mr. McKechnie and Jason Bonesteel, even Mr. Cardinal admits that race was not a factor in the profile. Cardinal Dep. 156:12-22.  Second, Mr. Cardinal does not clearly state that he opposed any unlawful activity.  Indeed, Mr. Cardinal's testimony varied wildly during the course

---

[3] Mr. Cardinal does assert that some weeks prior to the May 1, 2008 meeting, he conveyed certain oral discrimination complaints to Mr. McKechnie.  This allegation is denied, but of course must be taken as true for purposes of this motion.  Nevertheless, Mr. Cardinal does not claim to have been involved in any opposition activity on this occasion, nor is there even the remotest hint that there was any causal connection between the alleged conveyance of the complaints and the Mr. Cardinal's eventual resignation from employment.  Furthermore, when directly asked whether there was any other occasion besides

of his deposition on the question of what exactly it was that Mr. McKechnie asked him to do during the critical meeting that took place on or about May 1, 2008.  At one point, Mr. Cardinal asserted (about Mr. McKechnie) that "basically he wanted to get -- he wanted to get rid of the people that weren't per – performing," Cardinal Dep. 152:1-2, and confirmed that he "wasn't" instructed to make hiring decisions based on race.  Cardinal Dep. 152:25-153:3.  At another point, Mr. Cardinal referred to the allegation that Mr. McKechnie instructed him to hire more Caucasians at the West End store as being his "interpretation" that he "felt" from the conversation in question.  Cardinal Dep. 232:9-13.  Yet, later Mr. Cardinal testified that Mr. McKechnie stated that "we're too dark at West End," and that McKechnie wanted Cardinal to "lighten up the place" to "get a balanced mix."  Cardinal Dep. 152-165.  (Mr. McKechnie denies making these comments, but they are taken as true for purposes of this motion.)

   Even taking these allegations as true, Mr. Cardinal still does not explain in any of his versions of this meeting the manner in which he voiced or otherwise announced any opposition to the alleged direction to make race-conscious hiring decisions at the West End store. Indeed, his account of his alleged "opposition" activity is as follows:

> Q.    And you took Mr. McKechnie's comments as a whole, as I understand it, to mean that you should make hiring decisions based upon people's race?
>
> A.    I did.  That's the interpretation that I felt from that conversation, yes.
>
> Q.    Okay.  As I understand it, your response to that was that no, you're not going to do it this way?
>
> A.    I think I left -- I -- I -- you know, I just said I -- I don't know how I'm going to do it.  I mean, how are we going to -- you know.  So yes.

the May 1, 2008 meeting in which it was Mr. Cardinal's position that he was opposing unlawful discrimination by the company, he answered: "No."  Cardinal Dep. 232:19-22.

Cardinal Dep. 232:9-18.

Based on this testimony from the plaintiff himself, the Court should conclude that there is insufficient evidence to support a reasonable jury finding that Mr. Cardinal opposed unlawful discriminatory activity.

### 2. *There was no Adverse Action.*

Because Mr. Cardinal's employment ended only two days after his only incident of alleged protected activity, his assertion that he was "forced" to resign on May 3, 2008 is the only candidate for meeting the essential element of a retaliation claim that the defendant must take an employment action against the plaintiff that a reasonable employee would have found to be materially adverse. However, the undisputed evidence compels a finding that Mr. Cardinal voluntarily resigned – in the wake of admittedly being caught in a lie to his direct supervisor, no less – and, therefore, Mr. Cardinal cannot meet his burden as to this prong of the *prima facie* case.

Nothing could surpass Mr. Cardinal's own testimony as proof that he resigned his employment of his own volition. When asked to explain how it was that he was "forced" into this decision, Mr. Cardinal noted that Mr. McKechnie had failed to talk him out of resigning and, rather, had presented him with a "list" of things he needed to turn in that was prepared during his absence from the store. The implication apparently is that Mr. McKechnie's preparation for the possibility that Mr. Cardinal would resign or be terminated somehow constitutes, in itself, an act of termination by Mr. Mckechnie. But even this thin reed of an argument collapsed under greater scrutiny during Mr. Cardinal's deposition:

Q.     Well, let -- let me make sure I understand you.  The -- the list that
you're talking about was a list of things that you needed to turn in in order
to resign your employment; is that right?

A.     Right.

Q.     Okay.  And this came at the time that you were returning to the
store after having been away for a couple of hours; is that right?

A.     For about a hour, --

Q.     Okay.

A.     -- yes.

Q.     And during that time you were -- you were supposedly going to get
documentation of the fact that you had actually bought the -- the Antioch,
Tennessee house; is that right?

A.     Uh-huh, but Bill knew already that I didn't from John [Isaac].

. . .

Q.     You're saying that you believe John told Bill already that you had
bought a house elsewhere?

A.     Absolutely.

Q.     Okay.  So when you return after this mission did you come in and
say here's the paperwork or did you have any kind of envelope with you?

A.     Yes, I had an envelope with me and it – it was my stuff because I
knew at that point that – I mean, I knew.

Q.     You knew?

A.     I knew at that -- I knew at that point no matter what I said, no
matter how -- how bad I pleaded, throw myself on the mercy of the court
if you will, that I was not going to be employed after that Saturday.

Cardinal Dep. 233:24 - 235:8.  Accordingly, Mr. Cardinal admits that he knew he had

been caught in a lie, knew that it was significant enough that his employment was going

to be ending and, indeed, entered the store (before any list was presented) carrying an

envelope containing his "stuff" (i.e., company car keys, etc.). The fact that Mr. McKechnie had correctly anticipated this possibility during Mr. Cardinal's long absence from the store does not serve to mitigate the crucial admission by Mr. Cardinal that he resigned his employment. Indeed, in light of these undisputed facts, no reasonable jury could possible conclude that Mr. Cardinal did anything other then resign to avoid the consequences of his admitted failure to be truthful with his boss.

Moreover, except in cases of constructive discharge, resignation cannot constitute an adverse employment action. *Goldmeier v. Allstate Inc. Co., 337 F. 3d 629, 635 (6th Cir. 2003).* To demonstrate constructive discharge, Plaintiff must adduce evidence that (1) "the employer…deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and (2) the employer did so "with the intention of forcing the employee to quit…" *Moore v. Kuka Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999).* Put another way, "[a] constructive discharge requires a determination that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533-34 (6th Cir. 2004) (*quoting Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982).

To say that there are insufficient facts supporting a constructive discharge by Defendants in this case considerably understates the inadequacy of Mr. Cardinal's position – there are literally no facts whatsoever supporting such an assertion. Rather, Mr. Cardinal appears to be proceeding on the theory that his resignation was "forced" in the sense that he might well have been discharged had he not resigned. From this entirely speculative (not to mention legally irrelevant) jumping off point, Mr. Cardinal would

have the Court eviscerate the constructive discharge standard and hold that his own resignation, in the absence of any intolerable conditions, intentionally created or otherwise, constitutes an employment action against him that a reasonable employee would have found to be materially adverse. This Court should reject Mr. Cardinal's contention and conclude that summary judgment is appropriate as to Mr. Cardinal's retaliation claim.

### 3. There Was No Causal Connection to Protected Activity.

As discussed above, even if the Court concludes that Mr. Cardinal engaged in protected activity, his retaliation claim must fail for lack of an adverse employment action. That said, even if Mr. Cardinal's resignation were somehow transformed into an action taken against him by Defendants, it clearly was precipitated by his immediately prior conduct of lying to Bill McKechnie – conduct that Mr. Cardinal not only admits, but asserts now that he regrets and is not proud of. Cardinal Dep. 146:10-22.

Because Mr. Cardinal undertook to resign on his own, Defendants do not argue that they made any decision, and therefore cannot assert that they based a decision on Mr. Cardinal's deceitful conduct. But Mr. Cardinal's deposition testimony is instructive, nevertheless, as to the issues that were in play at the time he resigned. First, when asked about his allegedly forced resignation, Mr. Cardinal presented a timeline wholly at odds with his theory that his first and only opposition activity two days prior was to blame:

> Q. What made you think that Bill wanted you out of Five Guys?
>
> A. Well, I mean, our relationship for some reason had deteriorated from the opening of West End until this day here.
>
> Q. Okay. What -- what evidence of that is there? What facts do you –

> A.    I -- you know what, I don't have – have facts.  Only he -- only --
> only he knows it.  I don't know.  I -- I know that I was treated differently
> or -- I was treated differently the last 40 days I was there than what I was
> when I first got there.

Cardinal Dep. 156:23 - 157:9.  Since Mr. Cardinal admitted that his only alleged

protected activity occurred on May 1, 2008, a full 37 of the 40 days during which Mr.

Cardinal posits he was "treated differently" occurred *prior to* his alleged protected

activity.  When combined with the clear and, in fact, admitted motive for Mr. Cardinal's

voluntary resignation, it is evident that there can be no causal connection established

between alleged protected activity and an adverse action against Mr. Cardinal.  As such,

Mr. Cardinal's retaliation claim should be dismissed on these alternate grounds as well.

**D.    Mr. Cardinal Cannot Establish any Form of Discrimination Claim**

Although it remains unclear whether Mr. Cardinal is indeed pursuing a claim of

associational race discrimination, summary judgment is appropriate as to any such claim

because the undisputed facts would not support a reasonable jury verdict in Mr.

Cardinal's favor.  The record is devoid of any evidence whatsoever that any Defendant

ever considered, much less relied upon, any association Mr. Cardinal may have had with

African-American co-workers, or that any Defendant treated Mr. Cardinal disparately or

created a hostile work environment based on such an association.  Therefore, judgment as

a matter of law is compelled, and this Court should also enter summary judgment in

Defendants favor as to Mr. Cardinal's purported discrimination claims.

**E.    Mr. Cardinal Cannot Establish an Outrage Claim**

In Tennessee, outrageous conduct is merely another name for the tort of

intentional infliction of emotional distress.  *Moorhead v. J.C. Penney Co., Inc.*, 555

S.W.2d 713, 717 (Tenn. 1977).  The Tennessee Supreme Court recognizes the tort of

outrageous conduct as the following: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (*quoting* Restatement (Second) of Torts § 46(1)). Liability resulting from outrageous conduct "does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Medlin v. Allied Investment Co.*, 398 S.W.2d 270, 274 (Tenn. 1966) (*quoting* Restatement (Second) of Torts § 46 cmt. d).

A cause of action for outrageous conduct under Tennessee law has three elements: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain*, 936 S.W.2d at 622; *see also Johnson v. Woman's Hospital*, 527 S.W.2d 133, 144 (Tenn. Ct. App. 1975). The conduct must be such to cause the general community to exclaim "outrage!" *See, e.g., Johnson*, 527 S.W.2d at 140.

Even if they are all assumed to be true, Mr. Cardinal's allegations nevertheless fall far short of satisfying the "extremely high" standard for stating an outrage claim under Tennessee law. *See Jenkins v. Nashville Public Radio*, 2005 U.S. Dist. LEXIS 33280, *10 (M.D. Tenn. Dec. 9, 2005) (outrage standard is "an extremely high standard for plaintiff to meet"). Mr. Cardinal's allegations are clearly insufficient as a matter of law because, amongst other things, he has provided no proof, nor even alleged, that he suffered "a serious mental injury." *Id.* (evidence of serious mental injury required to state *prima facie* case) (*citing Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)).

Furthermore, Mr. Cardinal has not alleged that any "insult" or "threat[]" was directed at him but, even if he had, liability "does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities." Id. (*citing Medlin v. Allied Investment Co.*, 217 Tenn. 469, 398 S.W.2d 270 (Tenn. 1966)).

As explained above, Mr. Cardinal cannot establish any cognizable claim for retaliation or discrimination but, even if he could establish such a claim beyond all doubt, it would *still* be insufficient to state a claim for outrage. *See id*. at *13 (if discrimination constituted "outrage" on its own, "virtually every action brought under these [discrimination] statutes would include an intentional infliction of emotional distress claim."). *Cf. Lourcey v. Estate of Scarlett*, 146 S.W.3d 48 (Tenn. 2004) (plaintiff made prima facie case of outrage where defendant told the plaintiff that his wife was having a seizure, and then, in front of the plaintiff, shot his wife in the head and then shot himself).

Accordingly, as a matter of law, Mr. Cardinal's outrage cause of action should be dismissed.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request the Court grant its Motion for Summary Judgment and award its attorneys' fees and costs with respect to the claims of Plaintiff Cardinal.

Respectfully submitted,

**NASHVILLE 5G HOLDINGS, LLC,
JOHN R. ISAAC, and WILLIAM
MCKECHNIE**

/s D. Earl Baggett
Counsel for Defendants

King F. Tower (admitted *pro hac vice*)
Virginia State Bar No. 38767
D. Earl Baggett (admitted *pro hac vice*)
Virginia State Bar No. 50910
Attorneys for Defendants
WILLIAMS MULLEN, P.C.
P.O. Box 1320
Richmond, Virginia 23218-1320
Telephone: (804) 643-1991
Facsimile:  (804) 783-6507
ktower@williamsmullen.com
ebaggett@williamsmullen.com

W. Scott Sims
WALKER, TIPPS & MALONE
2300 One Nashville Place
Nashville, TN 37219
Tel.: 615.313.6004
Fax:  615.313.6002
*Counsel for Defendant, Nashville 5G Holdings LLC*

## CERTIFICATE OF SERVICE

The undersigned attorney for Defendants hereby certifies that on this 9th day of

October, 2009, a copy of the foregoing has been electronically filed with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following Attorneys for Plaintiffs:

Stephen W. Grace Esquire
1019 16th Avenue, South
Nashville, Tennessee 37212

Douglas B. Janney III, Esquire
2002 Richard Jones Road
Suite B-200
Nashville, Tennessee 37215

/s D. Earl Baggett
*Attorney for Defendants*

6915337_3.DOC