**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **MARYANN BROTHERS, et al.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **NASHVILLE 5G HOLDINGS, LLC, et al.,** | |
| **Defendants.** | |
| **and** | **Case No.:  3:08-1166** |
| **TEAIRA KING, et al.,** | **Judge Haynes** |
| **Plaintiffs,** | |
| **v.** | |
| **NASHVILLE 5G HOLDINGS, LLC, et al.,** | |
| **Defendants.** | |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AS TO PLAINTIFF BRODERICK PORTER-BAUGH**</u>

Pursuant to Fed.R.Civ.P. 56(b), Local Rules 7.01 and 56.01, and the Court's

Scheduling Order, the Defendants, Nashville 5G Holdings, LLC ("N5GH" or

"Company"), John R. Isaac, Jr. ("Isaac"), and William McKechnie, by counsel, hereby

submit the following memorandum of law in support of Defendants' Motion for

Summary Judgment as to Plaintiff Broderick Porter-Baugh ("Porter-Baugh").[1]

---

[1] Plaintiff Porter-Baugh's claims against the Defendants are the same as the claims of co-Plaintiff Timothy Wilson, and are based off of substantially the same set of operative facts.

# I.    INTRODUCTION

On June 12, 2009, Plaintiff Porter-Baugh along with two other plaintiffs filed a lawsuit against the Defendants. Mr. Porter-Baugh's lawsuit was consolidated with a prior lawsuit that initially consisted of six former employees of the N5GH.

In the instant matter, Mr. Porter-Baugh alleges that Defendants violated 42 U.S.C. § 1981 ("Section 1981") by engaging in disparate treatment based on his race and subjecting to him to a racially hostile work environment. However, Mr. Porter-Baugh cannot, as a matter of law, meet his burden of proof to establish disparate treatment based on his race or that a racially hostile work environment existed. As such, the Defendants are entitled to summary judgment on each of his claims.

As will be discussed in detail below, Mr. Porter-Baugh's hours were reduced as part of a company-wide effort to reduce labor costs, and such reductions affected non-African-Americans as well as African-Americans. The Company awarded hours to those employees who, regardless of their race, were the best performers and the most reliable. Instead of improving his work habits, productivity, and reliability to gain more hours, however, Mr. Porter-Baugh quit without notice.

Additionally, Mr. Porter-Baugh alleges that he was subjected to racial discrimination based on various work duties he was asked to perform. Merely asking an employee to perform aspects of their job is not, as a matter of law, an adverse employment action. Regardless, Mr. Porter-Baugh has not produced any cognizable evidence that these assignments were based on his race. Accordingly, he cannot establish a *prima facie* case for discrimination with respect to the work assignments that he believes were discriminatory.

Last, Mr. Porter-Baugh cannot establish a racially hostile work environment based solely on one alleged comment that he learned of well after his employment had ceased.

## II.    STATEMENT OF FACTS

### A.    Background of Nashville 5G Holdings, LLC

N5GH is a franchisee of Five Guys Enterprises, Inc., ("FGE") that specializes in serving freshly prepared hamburgers and hand-cut french fries in a casual dining atmosphere.  Statement of Undisputed Material Fact at ¶ 2 (hereinafter, "SOF"). McKechnie, who resides in Charlottesville, Virginia, is the managing member of N5GH. SOF ¶¶ 1, 3. Currently, N5GH operates three Five Guys restaurants in the Nashville area. SOF ¶ 4. However, prior to November 2008, N5GH operated only two restaurants: the Green Hills store, which opened on or about November 23, 2007, and the West End store, which opened on or about January 21, 2008.  SOF ¶ 4.

### B.    Mr. Porter-Baugh's Employment

Mr. Porter-Baugh was hired in November 2007 to work in the Company's Green Hills store as a crew member. SOF ¶ 11. The Green Hills restaurant, which opened for business on November 23, 2007, was the first Company restaurant in the Nashville area. The Green Hills restaurant was the only Company restaurant until the West End store opened on January 21, 2008. SOF ¶ 4 When Mr. Porter-Baugh was hired, Randy Williams was the General Manager of the Green Hills store and Plaintiff Stephen Cardinal served as the Company's Area Manager. Defendant Isaac was hired by Mr. Cardinal to serve as an Assistant Manager of the Green Hills store in November 2007. SOF ¶ 8. Mr. Isaac served as one of the Assistant Managers of the Green Hills store until Mr. Cardinal eventually promoted him to the position of General Manager of the Green

Hills store in January 2008. SOF ¶ 9. Mr. Isaac was ultimately promoted to Area

Manager by Mr. McKechnie after Mr. Cardinal resigned in May 2008. SOF ¶ 10.

### C.    Company Needs to Reduce Labor Costs

Prior to the Green Hills store opening for business and continuing through the

store's introductory period, the Company hired and staffed the store with more

employees than would ultimately be needed once the location was established in the

marketplace. Cardinal Dep. 118:20 – 119:3 (Cardinal testifying that they had cashiers

standing around and had employees opening the doors for customers when Green Hills

first opened); McKechnie Dep. 150:2 – 151:1 ("in the opening stages of a new market

you want to make sure that you have plenty of people on board to be able to create the

quality of the product that you're looking to provide and take care of the people that are

coming in your door . . . . there was an acceptance early on that, you know, [labor

percentages] would typically be higher in a new marketplace in a new restaurant than

they would be later on."). As time progressed into January and February, sales had

declined at the Green Hills store and N5GH needed to reduce labor costs/percentages

(percentage of employee hours vs. sales). SOF ¶¶ 28, 29; *see also* Cardinal Dep. 121:14-

24 (Management needed to "either increase sales or reduce the number of hours to – get

that [labor] percentage where you need it to be."); Cardinal Dep. 122:13-18 ("sales had

gone down [in the first half of 2008] and so the number of man hours or employee hours

needed was less than it had been previously."); McKechnie Dep. 151:24 – 152:2 ("we

were concerned about sales [declining], and when you're concerned about sales, you're

also concerned about the number of people that have got on the floor.").  Revenue at the

Green Hills store was steadily declining starting in January 2008 which continued

through July 2008, which necessitated the reduction in labor costs. SOF ¶¶ 28, 29.

Specifically, Green Hill revenues for the PPE December 23, 2007 were $75,364. For the

subsequent pay periods until July 6, 2008, the store's revenues were as follows: $67,517;

$61,445; $59,953; $57,213; $53,717; $50,328; $45,232; $51,554; $49,293; $50,218;

$49,708; $47,267; $45,494 and $43,619. SOF ¶ 29.

Mr. McKechnie and Mr. Cardinal had numerous discussions about reducing the

labor percentages. In turn, after Mr. Cardinal promoted Mr. Isaac to the General Manager

position of the Green Hills store, Mr. Cardinal pushed Mr. Isaac to reduce the store's

labor percentages and to hit labor targets. Cardinal Dep. 124:7-15. Indeed, even after Mr.

Isaac had made those cuts, Mr. Cardinal wanted him to make further cuts. Cardinal Dep.

124:7-15.

When cutting hours, the Company gave the majority of the hours to the store's

best performers. Cardinal Dep. 123:21 – 124:11. Individuals who were not the most

productive were likely to have their hours reduced or eliminated. Cardinal Dep. 124:3-6.

Mr. Cardinal believed that Mr. Isaac did, in fact, award hours to the most productive

employees and reduced hours from the less-productive employees. Cardinal Dep. 124:7-

15.

> Q: Okay.  And so I guess I'm trying to find out what -- what, if any,
> methods did you recommend to [Isaac] to reduce the labor or the
> hours?
> A. You know, number one, let's look at our people. You know, again,
> we've got the bus theory, and I know you're tired of hearing it, but,
> you know, there's some people we're going to let off the bus. There's
> people that's not per -- performing. I'm not there every day. Now,
> you know, again, when I'm there everyone works great, I mean,
> because I'm there. I mean, that's just the way it is. It's -- it's the horse
> and pony show. So I -- as -- as I do today, I allow my managers to
> make that de -- de -- decision.

Cardinal Dep. 123:4 – 123:16.

Plaintiff Porter-Baugh, like Mr. Wilson, was just one of the employees whose hours were reduced. As part of the Company's efforts to reduce labor costs, Mr. Isaac reduced the hours of both African-American and non-African-American employees. SOF ¶¶ 30, 31, 34-39. Similarly, there were African-Americans, such as Quinton Bell and LaShaunda Jackson, whose hours were not reduced by Mr. Isaac. SOF ¶ 32, 33. Mr. Isaac also reduced the hours of several Hispanic employees. SOF ¶¶ 31, 34-39.

**D.     Mr. Porter-Baugh's Allegation of Racial Discrimination**

**1)     Job assignments**

When asked how the Company had treated him differently because of his race, Mr. Porter-Baugh testified that he believed he and Plaintiff Timothy Wilson[2] would be "the only people that got the potatoes in the morning . . . . it seem[ed] like every time the potatoes [were] there we would do them." Porter-Baugh Dep. 28:5-13. Mr. Wilson testified that with respect to this duty, he "didn't really have a problem with doing the job, but is seem[ed] like they would just have [Wilson] and [Mr. Porter-Baugh] do it all the time when there was like other male employees there prior to us getting there that could have done it sometimes." Wilson Dep. 14:15 – 15:1. Mr. Porter-Baugh never complained about being assigned the job of handling (either unloading or cutting) the potatoes.

Mr. Porter-Baugh also testified that a "couple of times" Mr. Isaac and Randy Williams (the General Manager at the Green Hills store prior to January 2008) would tell

---

[2] Throughout Plaintiffs Wilson and Porter-Baugh's employment with N5GH, they "would tell people all the time that they were brothers"; however, during Mr. Wilson's

him and Mr. Wilson to take the trash out after they had clocked out for the day as they were leaving the store. Porter-Baugh Dep. 25:13-22; 26:3-12; 30:24 – 32:3.

### 2) Perceived Wage Discrepancies

Plaintiff Porter-Baugh also alleges that he believed he was discriminated against because he was making less than one Hispanic employee named "Geraldo." Porter-Baugh Dep. 21:19 – 23:4. However, this allegation is meritless as there were a number of non-African-American employees who were making $8 or less, including several white and Hispanic employees who were making $7.50 per hour. SOF ¶¶ 18, 20-23.

### 3) Reduction in Hours

Plaintiff Porter-Baugh also alleges that his hours were reduced based on his race, although he testified that he did not know if there were any employees other than African-Americans who had their hours cut. Porter-Baugh Dep. 29:6-14. Porter-Baugh's hours were reduced because the Company had legitimate business necessity to reduce labor costs. The most productive and reliable employees were awarded the majority of the hours. Additionally, there were African-American employees whose hours were not reduced as well as non-African-American employees whose hours were reduced. SOF ¶¶ 27-39. Porter-Baugh has produced no evidence (other than his conclusory statements) that contradicts these legitimate business rationales and his allegations are meritless.

### 4) Alleged Hostile Work Environment

Plaintiff Porter-Baugh also alleges that he was subjected to a hostile work environment based on a single alleged derogatory statement made by Mr. Isaac, an alleged statement he admittedly only learned of *after he had already quit*. Porter-Baugh

---

deposition, he noted that he and Porter-Baugh were not related to one another, rather,

Dep. 35:11 – 36:21. Specifically, Mr. Porter-Baugh claims that (after he was no longer employed by N5GH) he heard from Valerie Wrinkle (Plaintiff Cardinal's stepdaughter) that Mr. Isaac had referred to him and Mr. Wilson as "lazy niggers." Porter-Baugh Dep. 35:11 – 36:25. However, as will be discussed *infra*, Mr. Porter-Baugh cannot establish a claim for a hostile work environment as he never heard Mr. Isaac make any derogatory comments regarding African-Americans, nor does he allege that he was subjected to any other form of racial harassment. Porter-Baugh Dep. 35:11 – 36:25. Even if he had heard the comment, it would only constitute an isolated epithet or utterance without any bearing on the conditions of Mr. Porter-Baugh's employment. As such, the isolated utterance is wholly insufficient to create an actionable abusive working environment

## III. ARGUMENT

All of Plaintiff Porter-Baugh's claims of discrimination are untenable and are ripe for summary judgment.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." *Ford v. General Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002). A party opposing summary judgment may not rest upon mere allegations or denials in the pleadings, but must introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial. *Id.* at 552. "There mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

---

they were just close friends. Wilson Dep. 56:21 – 57:5; Porter-Baugh Dep. 15:1-11.

motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must draw inferences in favor of the non-moving party, it is not required to draw every conceivable inference from the record – only those that are reasonable. *Ford*, 305 F.3d at 551. Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) and Fed.R.Civ.P. 56(e)). Only factual disputes that might affect the outcome of the suit are material when ruling on a summary judgment motion. *Anderson*, 477 U.S. at 247-48. The nonmovant "must adduce more than a scintilla of evidence to overcome the motion [and] . . . must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Street v. J.C. Bradford Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

**B.     Mr. Porter-Baugh cannot establish, as a matter of law, that he was discriminated on the basis of his race**

Mr. Porter-Baugh's race discrimination claims "under Section 1981 [are] analyzed in the same fashion as a race discrimination claim brought under Title VII." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). "In the Sixth Circuit, claims under 42 U.S.C. § 1981 require the same standard of proof to establish a *prima facie* case as a Title VII claim." *Newman v. Federal Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

"In a disparate treatment case, liability depends on whether the protected trait (race) actually motivated the employer's decision . . .a disparate treatment claim cannot

succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Mr. Porter-Baugh may create a presumption of discrimination if he can establish the following elements of his *prima facie* case: (1) membership in a protected class; (2) that he suffered from an adverse employment action; (3) that he was qualified for the position; and (4) that he was treated differently from similarly situated people outside of the protected class. *Alexander v. Local 496, Laborers' Intern. Union of North America*, 177 F.3d 394, 402-03 (6th Cir. 1999) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If Mr. Porter-Baugh were able to establish a *prima facie* case by the preponderance of the evidence, which he cannot, Defendants may nevertheless offer any legitimate, non-discriminatory reason for the action, which Plaintiff may then rebut with evidence of pretext. *Alexander*, 177 F.3d at 403 (*citing Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996)).

> ### 1) *Mr. Porter-Baugh Cannot Establish that Race Motivated the Decision to Reduce his Hours*

Mr. Porter-Baugh's allegation that his hours were reduced based on his race are factually and legally baseless. Mr. Porter-Baugh alleges that it seemed like the Hispanic employees kept their hours but provides no basis for this belief. Save for this conclusory allegation, then, Mr. Porter-Baugh has no evidence that his hours were reduced based on his race. Porter-Baugh Dep. 28:14-22.

The Company and Mr. Isaac have presented legitimate and non-discriminatory reasons for the reduction in Mr. Porter-Baugh's hours, namely, that the Green Hills store had to reduce the overall number of employee hours in order to reduce labor costs. The decision as to which employees would receive the majority of hours was based strictly on

performance. Isaac Decl. at ¶ 20.  There was an overall reduction in monthly employee hours worked in the Green Hills store between the pay periods ending of December 23, 2007 and June 22, 2008, from a monthly high of 2010.96 hours to a low of 915.02 hours. SOF ¶27. The Company was attempting to reduce labor costs and maximize profit by reducing the overall number of employee hours. SOF ¶ 28. At the Green Hills store, for the PPE April 13, 2008 through the PPE May 11, 2008, numerous employees had their hours reduced, including non-African-Americans. SOF ¶¶ 30, 31, 34-39. For instance, one Hispanic employee, Jose Leiba, who eventually quit in April 2008, worked 73.55 hours for PPE March 2, 2008, 34.86 hours for PPE March 16, 2008, and 26.95 hours for PPE March 30, 2008. Mr. Leiba did not work any hours during the PPE April 13, 2008 when he quit.  SOF ¶ 31. Moreover, other African-American employees at the Green Hills store continued to work approximately the same number of hours in the months of April and May 2008 as they had earlier in the year.  Specifically, Quinton Bell, an African-American employee, worked anywhere from 56.42 hours to 80 hours per pay period between the PPE December 23, 2007 through June 8, 2008. SOF ¶ 32. LaShaunda Jackson, another African-American employee at the Green Hills store, consistently worked anywhere from 47.47 to 80 hours per pay period, averaging 60.8 hours per pay period (excluding the months of February and March 2007 when she took time off to deliver and care for her newborn). SOF ¶ 33.

Instead of working the hours that he was given in an effort to improve his performance and prove to management that he deserved more hours, Mr. Porter-Baugh elected to simply stop showing up for work. Porter-Baugh Dep. 42:2 – 42:25.

Mr. Porter-Baugh has no evidence that he was more qualified or more deserving for the position than those employees who actually did receive the majority of working hours, nor can he establish that similarly situated employees outside of his protected class were treated differently. Mr. Isaac was forced to reduce the labor costs due to declining revenues. When making the determination as to which employees would have their hours reduced, he logically awarded hours to those employees who were the most productive.

Mr. Porter-Baugh was not as fast or as productive as other employees. LaKeisha Tyson Decl. at ¶ 3. Eleanor Tyson, an African-American General Manager, also had an opportunity to observe both Mr. Wilson's and Mr. Porter-Baugh's work and she described them both as being "slow" and "turtles." E. Tyson Dep. 134:10-18. Additionally, Mr. Porter-Baugh had reported to work "late a couple of times." Porter-Baugh Dep. 30:10-11. Indeed, on occasions when he was offered *additional* hours he turned them down – whenever LaKeisha Tyson tried to get Mr. Porter-Baugh to work additional shifts or to work late, he would decline.[3] L. Tyson Decl. at ¶ 4. Accordingly, Mr. Porter-Baugh and Mr. Wilson, as corroborated by Eleanor Tyson and LaKeisha Tyson (neither of whom are even alleged to have harbored any discriminatory animus), were slow workers, were less reliable than other employees, and possessed less flexibility. Whether Mr. Isaac's and LaKeisha Tyson's assessment of Mr. Porter-Baugh's productivity, speed and reliability was correct is legally immaterial. In employment discrimination cases, summary judgment cannot be defeated by questioning the wisdom

---

[3] Mr. Porter-Baugh and Mr. Wilson rode to and from work together. Mr. Porter-Baugh relied on Mr. Wilson for transportation. This was one reason, among others discussed herein, that both Mr. Porter-Baugh's and Mr. Wilson's hours were both reduced – the company had limited flexibility on sending one home without having to send them both home.

of the employer's business judgment. *See, e.g., McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160-62 (6th Cir. 1990). The plaintiff "must provide evidence not that the defendant could have made a business decision that others might think is more fair, but that the defendant made its decision because of plaintiff's membership in a protected class." *Norbuta v. Loctite Corp.*, 1 Fed. Appx. 305, 2001 U.S. App. LEXIS 459 at *25 (6th Cir. 2001).

As such, Mr. Porter-Baugh has failed to produce any evidence that shows that he was as qualified for the position, or as deserving to be awarded hours, as the other employees in the store (both African-American and non-African-American) who were awarded the hours. Indeed, the undisputed evidence demonstrates the exact opposite. As such, Mr. Porter-Baugh is unable to establish a *prima facie* case of disparate treatment based on race with respect to the awarding of hours to employees.

Even assuming, for the sake of argument, that Mr. Porter-Baugh could establish a *prima facie* case, Mr. Isaac and the Company nevertheless had a legitimate, non-discriminatory reason for the reduction of hours – that is, Mr. Porter-Baugh was not as productive or reliable as the employees who were awarded hours during the time period when revenues had declined. Moreover, Mr. Porter-Baugh never complained about the reduction in hours, nor did he attempt to make any effort to work the hours that were assigned to demonstrate to Mr. Isaac or LaKeisha Tyson that he was indeed a productive or reliable employee.

> **2)**     ***Mr. Porter-Baugh Cannot Establish a Prima Facie Case of Discrimination With Respect to his Work Assignments.***

To prevail on his disparate treatment claim with respect to the assignment of job duties (taking out the trash and being required to unload potatoes), Mr. Porter-Baugh

must establish a *prima facie* case by showing: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position in question; and (4) that a comparable individual outside his protected class received more favorable treatment. *Birch*, 392 F.3d at 166, n. 12 (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

In the disparate treatment context, being assigned one job duty rather than another does not constitute an "adverse employment action." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758 (6th Cir. 2008) (In disparate treatment cases, "[a]n adverse employment action is an action by the employer that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," plaintiffs complaints about her training versus white employees did not constitute an adverse employment action); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594-95 (6th Cir. 2007) (unlike an "adverse employment action" in the retaliation context, in a discrimination context under §703(a), the adverse employment action must "be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (*citing Burlington Northern and Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)); *Zverina v. TRW Fuji Valve, Inc.*, 2006 U.S. Dist. LEXIS 23968 (E.D. Tenn. Mar. 20, 2006) ("Plaintiff's allegations that he was reprimanded in situations where others were not and that others received training that he did not receive do not rise to the level of an 'adverse employment action.'"); *Carrero v. Robinson*, 2007 U.S. Dist. LEXIS 40805, 59-61 (D. Colo. 2007) ("At least for Title VII purposes, the definition of "adverse action" is broader in the retaliation context than it is in the disparate treatment

context," thus plaintiff's complaints about his specific job assignments did not

"demonstrate any adverse employment action, [and] the Defendant [wa]s entitled to

summary judgment on his disparate treatment claims under Title VII and § 1981.");

*Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (In order to meet the standard of an

adverse employment action in the disparate treatment context, there must be "a materially

adverse change in the terms and conditions of employment" that is "more disruptive than

a mere inconvenience or an alteration of responsibilities.").

As such, Ms. Porter-Baugh's allegation that Mr. Isaac would require him and Mr.

Wilson to take out the trash or to unload potatoes does not rise to an adverse employment

action in the disparate treatment context. Accordingly, Mr. Porter-Baugh cannot establish

a *prima facie* case of discrimination with respect to job assignments because he cannot

satisfy, as a matter of law, the requirement set forth in the second prong – that he suffered

an adverse employment action.

Even if the requirement that Mr. Porter-Baugh occasionally perform some of the

less desirable tasks within his job description constituted an "adverse employment

action" sufficient to satisfy the second element of his *prima facie* case, which the case

law makes clear that it does not, Mr. Porter-Baugh's claim still fails at the fourth prong

because he has provided insufficient evidence that similarly situated white or Hispanic

employees were treated differently. *See Lindsey*, 295 Fed. Appx. at 758 ("[W]hile

Plaintiff claims that white employees were allowed to participate in the extra training and

were permitted to shadow employees during work time, she has not explained how these

employees were similarly situated to her so as to justify an inference that her disparate

treatment was based upon her race."); *McCarroll v. DiSantis*, 2006 U.S. Dist. LEXIS

11023, *18 (S.D. Ohio 2006) (Plaintiff failed to establish prima facie disparate treatment case by comparing his job duties to a white co-workers).

Since Mr. Porter-Baugh cannot establish the second or fourth prongs of his *prima facie* case based on alleged discriminatory job assignments, this claim should be dismissed at summary judgment.

Moreover, with respect to alleged discriminatory assignment of job duties, Mr. Porter-Baugh has failed to produce any evidence that any of his job assignments were based on his race. It is a fact that Five Guys restaurants serve freshly cut french fries, which requires large amounts of potatoes to be delivered to each store. Upon delivery, it is the store's responsibility to have the bags of potatoes unloaded and ultimately prepared to be turned into french fries. Plaintiffs Wilson and Porter-Baugh were physically capable of unloading the potatoes and cutting the potatoes. They were asked to perform this duty because it was part of their job description, it had to be done to operate the restaurant, and they were physically capable of doing it - there is absolutely no evidence that the potato duty assignments were based on Mr. Wilson's or Mr. Porter-Baugh's race.[4] Furthermore, Mr. Porter-Baugh has no evidence that similarly situated employees outside of his protected class were not likewise instructed to unload or cut potatoes. Indeed, they were. The undisputed record shows that there were many occasions that non-African-American

---

[4] Moreover, it is hard to imagine how a restaurant could continue to operate if employees refused to perform certain tasks. Indeed, other employees, including some of the co-Plaintiffs, would have likely preferred to cut the potatoes instead of cleaning the lobby, running the cash register, or cleaning the restrooms. Since Mr. Porter-Baugh never complained about having to handle the potatoes, it is illogical to assume that Mr. Isaac or any other management level employee at the restaurant would know what duties Mr. Porter-Baugh subjectively perceived to be less favorable work assignments. For this reason, the law is sound when it states that the requirement to perform job assignments do not constitute an adverse employment action under the disparate treatment analysis.

employees were required to unload and cut the potatoes. Isaac Decl. at ¶ 5, L. Tyson Decl. at ¶ 6.  Employees that were capable of lifting the heavy bags of potatoes were asked to perform the assignment, and such assignment had absolutely nothing to do with the employee's race. As such, when Mr. Porter-Baugh and Mr. Wilson were assigned the task of unloading the potatoes, it was based on legitimate, non-discriminatory reasons – it was part of their crew member duties and they were physically capable of handling the heavy, 50 pound bags.

Second, with respect to Mr. Porter-Baugh's allegation that he and Mr. Wilson were asked by Mr. Isaac to take the trash out after they were "off the clock" but before they could go home "a couple of times" is simply not evidence of any sort of racial discrimination. Assuming that Mr. Isaac did ask Mr. Porter-Baugh to take the trash out before he could go home, there was clearly a legitimate non-discriminatory business reason for such a request. Simply put, it is a job duty of crew members to take out the trash. The trash is taken out on a regular basis each and every day during each and every shift. Porter-Baugh Dep. 26:14 – 27:3 (testifying that taking out the trash was something that was part of their job duties during their shift, and that the trash could be taken out two or three times a shift). Even if Mr. Porter-Baugh or Mr. Wilson were occasionally asked to take the trash out after they had clocked out, it would have been because they should have taken the trash out before they had clocked out. Neither Mr. Porter-Baugh nor Mr. Wilson ever complained to Mr. Isaac, Mr. Cardinal, Mr. McKechnie or anyone else in management that they thought it was discriminatory or unfair to be asked to take the trash out on their way out of the store to go home. Porter-Baugh Dep. 41:6-15. Mr. Porter-Baugh has provided no evidence that such requests to take the trash out was based

on his race and he and Mr. Wilson have no evidence that employees outside of the protected class were not also asked to take the trash out on their way out. Porter-Baugh Dep. 27:7-13.The allegation of this occasional request, absent any evidence whatsoever that that it was connected to their race in any way, obviously cannot form the basis of a racial discrimination claim under Section 1981 or any federal or state law.

### 3)     *Mr. Porter-Baugh Cannot Establish a Prima Facie Case of Discrimination With Respect to his Pay.*

Mr. Porter-Baugh's allegation that he was discriminated against because he was paid less than a single Hispanic employees must also fail. Mr. Porter-Baugh testified that sometime "at the beginning" in January or February 2008, he was making $8 or $8.50 per hour whereas a Hispanic employee by the name of "Geraldo" was making $10 per hour. Porter-Baugh Dep. 21:19 – 23:5. However, at no time did Mr. Porter-Baugh ever raise the issue with management or state that he thought the pay discrepancy was unfair or discriminatory.  Moreover, during the January/February 2008 timeframe, Plaintiff Cardinal was still the Area Manager and was actually the member of management that gave Geraldo the raise to $10. In any event, Mr. Porter-Baugh has not provided any evidence that a wage difference between his pay and Geraldo's was based on race.

More importantly, however, is the fact that between November 2007 and the pay period ending ("PPE") January 6, 2008, there were at least 13 non-African-American crew member employees at the Green Hills store earning an hourly wage of $8 or less. SOF ¶ 18. In fact, there were several Caucasian employees and at least one Hispanic employee earning an hourly wage of $7.50, which was *less* than what Mr. Porter-Baugh was earning. SOF ¶¶ 20, 21. Additionally, there were at least three African-American employees making more than $9 per hour between November 2007 and the pay period

ending January 6, 2008. SOF ¶ 19. Also fatal to Mr. Porter-Baugh's pay discrimination claim is that the last pay period in which Mr. Porter-Baugh worked was the pay period ending May 11, 2008 – during that same pay period, there were at least eight Hispanic or Caucasian employees earning the same hourly rate, or less, than Mr. Porter-Baugh and Mr. Wilson. SOF ¶ 22. Clearly, then, the undisputed record belies any conceivable claim of racially-disparate pay.

> **C.      Mr. Porter-Baugh, as a matter of law, cannot establish that he was subjected to a racially hostile work environment under Section 1981**

Mr. Porter-Baugh also states in his responses to interrogatories that he is pursuing a claim for a hostile work environment. Presumably, the basis of Mr. Porter-Baugh's hostile work environment claim is a racial epithet allegedly made by Mr. Isaac. Mr. Porter-Baugh (and Mr. Wilson) alleged that he was told by Valerie Wrinkle, Mr. Cardinal's stepdaughter, that Mr. Isaac had called Mr. Porter-Baugh and Mr. Wilson "lazy niggers." Even assuming that Mr. Isaac made this comment (despite that his sole evidence of it is based entirely on hearsay), Mr. Porter-Baugh's claim for a hostile work environment must fail.

During Mr. Porter-Baugh's employment with N5GH, he never heard Mr. Isaac or anyone else use any racially offensive language. Porter-Baugh Dep. 35:11-14. Mr. Porter-Baugh first learned of the racially offensive comment allegedly made by Mr. Isaac long after Mr. Porter-Baugh had quit his employment with the Company. Porter-Baugh Dep. 35:11 – 36:25.

Title VII and Section 1981 (since they are both analyzed under the same framework) prohibit the maintenance of a "workplace [which] is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working

environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). In order to prove a

hostile environment claim, a plaintiff must be able to show more than a "mere utterance

of an . . . epithet which engenders offensive feelings in [an] employee," as this "does not

sufficiently affect conditions of employment" to constitute actionable harassment. *Harris*,

510 U.S. at 21-22. *See also*, *Brooks v. City of Springfield*, 2008 U.S. Dist. LEXIS 58302

(M.D. Tenn. July 24, 2008) (J. Haynes).

Specifically, to establish a *prima facie* case of a hostile work environment, Mr.

Porter-Baugh must establish the following five elements: (1) that he was a member of the

protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the

harassment was based on his race; (4) that the harassment had the effect of unreasonably

interfering with his work performance by creating an intimidating, hostile, or offensive

work environment; and (5) the existence of employer liability. *Hafford v. Seidner*, 183

F.3d 506, 512 (6th Cir. 1999). Whether a work environment is hostile or abusive can be

determined only by looking at all of the circumstances. *Harris*, 510 U.S. at 23. The Court

must take into account the frequency of the discriminatory conduct; its severity; whether

it was physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interfered with the Plaintiff's work performance. *Harris*, 510 U.S. at 23.

In the instant matter, Mr. Porter-Baugh cannot establish that he was subjected to

unwelcome racial harassment as he only learned about it well after he had resigned,

without notice. [5] Even assuming, *arguendo*, that he could satisfy his burden on that

_____

[5] In *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 501-502 (6th Cir. 2009), the Sixth
Circuit upheld summary judgment on plaintiff's sex and race hostile work environment
claims. In *Ladd*, the plaintiff regularly overheard the words "lesbian," "dyke," and "gay"

element, however, Mr. Porter-Baugh cannot establish that the harassment had the effect

of unreasonably interfering with his work performance by creating an intimidating,

hostile, or offensive work environment. Further, Mr. Porter-Baugh also fails to establish

that the one alleged comment made by Mr. Isaac was "pervasive." Thus, even if he *had*

heard the comment such that he was "subjected to unwelcome racial harassment" (which

he does not even allege was the case) the Sixth Circuit has affirmed grants of summary

judgment where evidence of severity or pervasiveness is insufficient to proceed to trial.

*See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007).

Similarly, Mr. Isaac's one alleged comment is not sufficiently "frequent" to

satisfy a *prima facie* case. The comment allegedly made by Mr. Isaac would be no more

than a mere, isolated, offensive utterance, had Mr. Porter-Baugh heard it or learned of it

during his employment. "As the Supreme Court has long recognized, occasional

utterances of racial epithets, although they engender offensive feelings in an employee,

would not sufficiently alter the terms and conditions of employment to violate Title VII [,

Section 1981, or the THRA]." *Allen v. Mich. Dep't. of Corr.*, 165 F.3d 405, 415 (6th Cir.

1999) (*citing Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). Offhand

comments or isolated incidents, unless extremely serious, will not amount to

---

used derogatively and was called a "black bitch" by a foreman. *Id*. She also learned that a foreman referred to her as "a nigger and a lazy nigger." *Id*. at 501 n2.  As to the "lesbian," "dyke," and "gay" comments, they were not directed at plaintiff, and their "severity" was thus diminished. *Id*. at 501-02. The "black bitch" comment *was* directed at plaintiff and was severe, but was only "one specific incident."  The "nigger and lazy nigger" comments could not sustain her claim because the court could not determine if she learned of them before her termination but, even if she had, it was "insufficient to create a hostile work environment." *Id*. at 501 n2. *See also*, *also Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (concluding that evidence regarding harassing behavior was not relevant to the plaintiff's hostile-work-environment claim because there was no evidence that the plaintiff was aware of the conduct at the time).

discriminatory changes in the terms and conditions of employment. *In re Rodriguez*, 487 F.3d 1001, 1010 (6th Cir. 2007) (*citing Faragher*, 524 U.S. at 788). Accordingly, Mr. Porter-Baugh cannot establish severe or pervasive racial conduct attributed to Mr. Isaac, nor can Mr. Porter-Baugh establish that this one alleged isolated comment, that he learned about well after he had quit, affected the terms and conditions of his employment.

Based on the foregoing, Mr. Porter-Baugh's claim for a hostile work environment under Section 1981 should be summarily dismissed. Title VII, as well as Section 1981 and the THRA, do not impose a "general civility code for the American workplace," and courts should pay "careful attention to the requirements of the statute[s]." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "Title VII, [as well as Section 1981 and the THRA do] not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of race." *Id.*

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request the Court grant its Motion for Summary Judgment and award its attorneys' fees and costs with respect to the claims of Plaintiff Porter-Baugh.

Respectfully submitted,

**NASHVILLE 5G HOLDINGS, LLC,
JOHN R. ISAAC, and WILLIAM
MCKECHNIE**

/s  D. Earl Baggett
                Counsel

King F. Tower (admitted *pro hac vice*)
Virginia State Bar No. 38767
D. Earl Baggett (admitted *pro hac vice*)
Virginia State Bar No. 50910
WILLIAMS MULLEN, P.C.

P.O. Box 1320
Richmond, Virginia 23218-1320
Telephone: (804) 643-1991
Facsimile:  (804) 783-6507
ktower@williamsmullen.com
ebaggett@williamsmullen.com

W. Scott Sims
WALKER, TIPPS & MALONE
2300 One Nashville Place
Nashville, TN 37219
Tel.: 615.313.6004
Fax:  615.313.6002
sims@walkertipps.com

*Counsel for Defendant, Nashville 5G Holdings LLC*

6938139_2.DOC

## CERTIFICATE OF SERVICE

The undersigned attorney for Defendants hereby certifies that on this 9th day of

October, 2009, a copy of the foregoing has been electronically filed with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following Attorneys for Plaintiffs:

> Stephen W. Grace Esquire
> 1019 16th Avenue, South
> Nashville, Tennessee 37212
>
> Douglas B. Janney III, Esquire
> 2002 Richard Jones Road
> Suite B-200
> Nashville, Tennessee 37215

                                          /s D. Earl Baggett           .
                                          *Attorney for Defendants*

6938139_2.DOC