IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARYANN BROTHERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NASHVILLE 5G HOLDINGS, LLC, et al., <br><br> Defendants. <br><br> and <br><br> TEAIRA KING, et al., <br><br> Plaintiffs, <br><br> v. <br><br> NASHVILLE 5G HOLDINGS, LLC, et al., <br><br> Defendants. | Case No.: 3:08-1166 <br> Judge Haynes |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE

Plaintiffs oppose Defendants' motion in limine with the exception of the issue involving Defendant John Isaac's bankruptcy filings (which Plaintiffs agree not to raise unless it somehow becomes relevant during trial and then only after addressing the issue with the Court). The remainder of the evidence and testimony that Defendants seek to preclude is relevant, extremely probative and properly admissible.

### FACTUAL BACKGROUND

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), 42 U.S.C. § 1981, the

Tennessee Human Rights Act, Tenn. Code Ann. 4-21-101, *et seq*. ("THRA"), and Tennessee common law. In total, nine former employees brought this action against their former employer, Nashville 5G Holdings, LLC ("5G") and two of 5G's managers, John Isaac and William McKechnie. Five of the plaintiffs were non-manager "crew members" at 5G's restaurants. They have fully compromised their claims with Defendants. The four remaining plaintiffs, Maryann Brothers, Stephen Cardinal, James Newman and Teaira King, were managers at two of 5G's "Five Guys Burgers and Fries" restaurants in Nashville.

Defendants discriminated and retaliated against Plaintiffs during their employment based upon race and/or for opposing and refusing to participate in Defendants' illegal discriminatory conduct. Defendants further subjected Plaintiffs to a hostile and abusive working environment based upon race and/or for opposing or refusing to participate in racial discrimination in the workplace. Plaintiffs as well as current and former employees have testified in depositions and will testify at trial in this case that, once he became General Manager for one of 5G's restaurants and later Operations Manager over all of 5G's restaurants, Defendant Isaac began discriminating against employees and subjecting them to a hostile and abusive working environment based upon race. Isaac's discriminatory conduct throughout the spring of 2008 included:

- Constantly referring to black employees as "niggers," "monkeys," and "lazy ass niggers" in the workplace. (E. Tyson Dep. 57; King Dep. 43-45, 50; Bell Dep. 60-61, 67; Wrinkle Dep. 18-20, 24; Johnson Dep. 44-45; Brothers Dep. 22, 26-27, 37).[1]

- Constantly stating that black employees "act like a bunch of monkeys and belong in a zoo." (E. Tyson Dep. 25-26, 31, 33, 51-53, 57; King Dep. 44-45, 50; Bell Dep. 22; Hall Dep. 9-11; Moore Dep. 54-55; Johnson Dep. 39-43; Brothers Dep. 22, 26-27; Newman Dep. 52-53).

- Stating in the workplace, "I got to get these niggers out of here." (White Dep. 21-22).

---

[1] Plaintiffs filed all of the depositions taken in this case at Docket Nos. 66-72.

2

- Instructing managers to "get rid of" black employees, "not to hire any more black or Mexicans at the Green Hills store," to "only hire white people," and to "cut black employees' hours so they would quit." (E. Tyson Dep. 25, 41-42; L. Tyson Dep. 26, 28, 30-31; Johnson Dep. 26-27, 30-32, 35, 73; Brothers Dep. 40, 73, 224-25; Moore Dep. 31-32; Porter-Baugh Dep. 28; Wrinkle Dep. 16-17).
- Stating that there were "too many black people in here and we need to lighten the place up." (King Dep. 129-34).
- Referring to Plaintiff Newman's and current employee Charles Wilkerson's significant others, who are African-Americans, as their "nigger lovers" and telling Newman that he did not approve of him "being with that nigger again." (Wilkerson Dep. 10-11, 19, 31, 45-46; Newman Dep. 47, 49; Wrinkle Dep. 21-22; Brothers Dep. 37-38; E. Tyson Dep. 42-43, 57).
- Stating that Thomas White, an African-American former hourly employee, "looked like a gorilla," making fun of "his large lips," and stating that he could not work at the cash register in front of customers. (Brothers Dep. 215, 210).
- Initially telling Plaintiff Brothers that "even though you are black, you don't act black." (Brothers Dep. 221).
- Constantly asking Plaintiff King, "are you black, or are you white?" to the point that it offended her and she reported it. (King Dep. 36-38, 61).
- Stating that Dominique Bell and Latoya Moore, African-American former employees, were "too ghetto" and that they did things that were "black things" among numerous other similar and related illegal workplace statements. (Bell Dep. 67-68, 72-73, 88; Moore Dep. 49, 54-55; Brothers Dep. 40, 211, 215, 232-33).

Isaac further ordered assistant managers such as Ashley Johnson, a Caucasian, "to only hire white people" and stated that they "needed more white people working there." (Johnson Dep. 26-27; E. Tyson Dep. 25). To effectuate his goal, Isaac told Johnson and other scheduling managers to "cut [black employees'] hours [so] they would quit" or to take them off of the work schedule altogether. (Johnson Dep. 31-32; Brothers Dep. 40, 73). Several black employees have testified in this case that, after Isaac took Cardinal's job as Area Manager, their work hours were either dramatically reduced or eliminated entirely. These employees further saw the work

3

schedules and observed that non-black employees' hours were not cut and eliminated like theirs were. (Wilson Dep. 31-36, 45-47, 50; White Dep. 19, 39-41; Moore Dep. 31-32; King Dep. 55-57, 72-75, 80-81; Johnson Dep. 35; L. Tyson Dep. 67-68). Isaac further constantly assigned black employees menial and degrading tasks, such as taking out the garbage and cleaning the bathrooms multiple times per day even when other employees had been pre-scheduled and were available to do so. (Bell Dep. 31-32; Moore Dep. 51-52; Porter-Baugh Dep. 25-28, Wilson Dep. 14-15, 29-30). Witnesses have testified as well that Isaac's behavior worsened after he began to drink alcohol and become intoxicated at work during the day. (Brothers Dep. 247-48).

Numerous 5G employees reported Isaac's racist conduct to Plaintiff Cardinal, Eleanor Tyson, Plaintiff Brothers, and Assistant Manager Ashley Johnson throughout the spring of 2008. (E. Tyson Dep. 25-28, 31-34, 38-44, 51-57, 105-06; Cardinal Dep. 74-76, 80-81, 96, 109-10, 140; Brothers Dep. 22, 28, 32-34, 46-47, 112-14, 215-16, 229-30; King Dep. 43-44, 77, 79; Newman Dep. 52-53, 55, 84, 87-88; Johnson Dep. 46-47; Wilson Dep. 40; Bell Dep. 13-14, 24-25, 61-63; Moore Dep. 60). Understandably, Defendants would like to have evidence and testimony about Isaac's inexcusable and illegal conduct excluded from the trial of this case. Unfortunately for Defendants, this evidence and testimony is relevant, extremely probative and properly admissible.

# ARGUMENT

*Evidentiary Standards*

All relevant evidence is admissible except as otherwise provided. Fed. R. Evid. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. In this case, issues of consequence include whether Defendants made employment decision adversely affecting Plaintiffs because of their race or in retaliation for their opposition to and refusal to participate in Defendants' discriminatory conduct and whether Defendants maintained a racially hostile work environment.

*Evidence and Testimony About Harassment or Discrimination of Non-Plaintiffs, Including Assigning Menial and Degrading Tasks to African-Americans and Cutting Hours of African Americans*

Plaintiffs intend to introduce at trial evidence and testimony that Isaac and McKechnie are racists. Plaintiffs will prove that Isaac directed horribly offensive racial comments and slurs at Plaintiffs and other current and former employees. He assigned degrading and menial tasks to African-American employees, and he directed that the work hours of African-American employees be cut. Defendants ask the Court to limit evidence and testimony in this case to only words spoken to and actions directed at the remaining plaintiffs. Defendants' request is improper and should be denied.

Evidence that Isaac direct racial slurs and offensive comments to individuals other than Plaintiffs in the workplace tends to make it more likely that he discriminated against Plaintiffs because of their race or their opposition to his racist conduct. The Court considered this same issue in *Robinson v. Runyon*, 149 F.3d 507, 512-13 (6th Cir. 1998) and reasoned --

Here Robinson alleges that she was treated differently because of her race and in violation of Title VII. Evidence of a racially hostile atmosphere that was condoned by the supervisors in the CBMC clearly is relevant to such a proposition because it illustrates the attitudes of those supervisors. Therefore, the racist employment application, which was circulated and allegedly known to upper level management, yet not immediately condemned, plainly makes the existence of racially motivated actions by management of the CBMC more probable. *Cf. Polanco v. City of Austin, Texas*, 78 F.3d 968, 980 (5th Cir.1996) (noting that evidence of discriminatory practices against Hispanics in the workplace was probative of whether the individual plaintiff was terminated because of his nationality); *Estes v. Dick Smith, Ford Inc.*, 856 F.2d 1097, 1103 (8th Cir.1988) (finding that background evidence of an employer's discriminatory history and work practices is relevant to determination of whether an individual employee was disparately treated even when none of that past discrimination was aimed specifically at the employee involved); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987) (noting that "circumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim" and that "[w]hile evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff such evidence does tend to add 'color' to the employer's decision making processes and to the influences behind the actions taken with respect to the individual plaintiff."). In *Estes,* the court, in finding evidence of statistical disparities and racially discriminatory treatment of black customers relevant to the plaintiff-employee's individual disparate treatment case, noted that "circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices--evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Estes*, 856 F.2d at 1103. We agree. Robinson is permitted to establish credence for her argument that discrimination played a role in her termination by presenting evidence of the racially hostile attitudes in her particular office and racial insensitivity among the supervisors within that office. We are guided in this determination by the reality that intentional discrimination is often difficult to prove without significant reliance on circumstantial evidence. Rarely will

6

> there be direct evidence from the lips of the defendant proclaiming his or her racial animus. *See Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir.1997) ("It is the rare situation when direct evidence of discrimination is readily available, thus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof."). Therefore, we must be mindful not to cripple a plaintiff's ability to prove discrimination indirectly and circumstantially "by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance...." Estes, 856 F.2d at 1103 (quoting *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir.1987)).

Accordingly, evidence of Isaac's racially discriminatory treatment of other employees and the racially hostile work environment that he created is plainly admissible. As the Court recognized in *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999), racial epithets need not be hurled at the plaintiff in order to contribute to a work environment that was hostile to her. Instead, evidence of discriminatory conduct towards other African-American employees is relevant and admissible to establish a hostile work environment. *Id.* Thus, Defendants' motion to exclude evidence of Isaac's racially inappropriate conduct toward non-plaintiffs should be denied.

### *Evidence and Testimony About Defendant John Isaac's Offensive Yard Art*

Defendants seek to exclude evidence and testimony that Isaac displayed on his lawn a "lawn jockey," a figurine that many (other than Defendants)[2] consider to be racially derogatory and offensive. "Several" employees advised Plaintiff Cardinal and current General Manager Eleanor Tyson that they had seen "lawn jockeys" or "black figurines . . . with hangman's noose or something" on Isaac's property. (E. Tyson Dep. 35-36). Isaac's action in maintaining the "lawn jockey" is relevant, and therefore admissible under Rule 401, because it illustrates Isaac's

7

Case 3:08-cv-01166 Document 90 Filed 01/15/10 Page 7 of 11 PageID #: 2384

thoughts and attitudes about race and makes the existence of a discriminatory motivation for his treatment of Plaintiffs in the workplace more probable than it would be without the evidence. Rule 403 does not bar this testimony, since it only applies when the "probative value [of the evidence is] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added). This type of evidence, however, is the very essence of any case based on race discrimination or a racially hostile work environment, and is essential for the jury to be able to understand the discrimination, harassment and retaliation that Plaintiffs experienced. The evidence is relevant – tending to show that Isaac made employment decisions and treated Plaintiffs differently based on race and for opposing or refusing to participate in his racist conduct – and should be admitted.

### *Evidence and Testimony About Defendant John Isaac's Inebriation in the Workplace*

Defendants seek to exclude proof that Isaac frequently acted appropriately at work until he became inebriated at lunch and would return to make horribly racially offensive statements. This trial hinges on the credibility of the witnesses. Isaac says he did not do any of the things that Plaintiffs and numerous other witnesses say he did in the workplace. The jury will have to decide whom to believe. To that end, proof that Isaac frequently was intoxicated at work tends to make it more likely that he may not have perceived events at work, or recall them now, as they actually occurred. Accordingly, this evidence should be admitted to assist the jury in fairly weighing the credibility of Isaac.

---

[2] Defendants boldly proclaim the "Lawn Jockey" to be a celebration of a "hero of African-American history and culture." (Docket No. 82, Mem. at 5, n. 1). Plaintiffs suggest that if Defendants genuinely believed this, or thought that any juror would, they would not have asked the Court to bar any mention of it.

8

*Evidence and Testimony About Defendant William McKechnie's Decision to Promote Defendant John Isaac Over the Objectively More Qualified Eleanor Tyson*

The fact that Defendant McKechnie never even considered Eleanor Tyson, who is African-American, for the Area Manager position that he immediately gave to Defendant Isaac following the constructive discharge of Plaintiff Cardinal despite Ms. Tyson's objectively superior qualifications for the job is further evidence of Defendants' discriminatory animus in making employment decisions affecting employees at their Nashville restaurants, including Plaintiffs. McKechnie reasoned that, even though Ms. Tyson has "done a great job" as a 5G General Manager, he "didn't feel like she represented enough of the qualities or *the profile* that I was looking for." (McKechnie Dep. 203; E. Tyson Dep. 9, 13, 141-45). Combined with the testimony in this case that Defendants used a "hiring profile" that excluded African-American employees from consideration, Defendants' admitted failure to consider Ms. Tyson for the Area Manager position is further evidence that, in subjecting Plaintiffs to adverse employment actions, Defendants were motivated at least in part by race. (Cardinal Dep 151-56, 161-64, 169, 231-32).

Like Ms. Tyson, Plaintiffs in this case were managers. There is testimony that McKechnie stated in the workpalce, "we're too dark at West End, okay, we need to get rid of all these managers . . . we need to make the 16 percent profile . . . ." (Cardinal Dep. 160-61). McKechnie elaborated, "when you walk in there there's no white Caucasian employees. We're at 90 percent black employees there. Why is that?" (Id. at 164). McKechnie stated, "We need to lighten up the place. We need to . . . make sure that we get a balance mix . . . so when our guests come in there they don't see all of one race." (Id. at 166). McKechnie's not considering Ms. Tyson for the Area Manager position was obviously based on race. He admitted that Ms. Tyson had done "a great job" performing her General Manager job. She was objectively more qualified

9

than Isaac, having over 20 years' experience as a restaurant General Manager compared to his no years' experience, and she had been certified by Five Guys corporation in Virginia whereas Isaac had not been certified. (E. Tyson Dep. 9, 13, 141-45; Newman Dep. 37).[3] This case is about Defendants' illegal motivation and racial bias in making employment decisions. Their blatant act of discrimination toward Ms. Tyson is probative evidence of their true motivation with respect to the decisions that they made affecting Plaintiffs' employment, as well. Accordingly, the Court should allow Plaintiffs to present evidence that Ms. Tyson, like her co-manager Plaintiffs, was subjected to an adverse employment action by Defendants because of her race.

## CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court deny Defendants' motion in limine with the exception of the issue involving Defendant John Isaac's bankruptcy filings (which Plaintiffs agree not to raise unless it somehow becomes relevant during trial and then only after addressing the issue with the Court). The remainder of the evidence and testimony that Defendants seek to preclude is relevant, extremely probative and properly admissible.

---

[3] Isaac's lack of certification is probative circumstantial evidence of discriminatory intent. Defendants testified that all managers were "required" to be certified by Five Guys. Each Plaintiff was certified, while Isaac was not. (Newman Dep. 23-24, 30, 37; E. Tyson Dep. 8-9). The fact that Isaac was not certified and was promoted to Area Manager rather than discharged despite his lack of certification – an objective qualification for the job – is further evidence that an impermissible motive played a role in Defendants' decisions affecting Plaintiffs' employment.

Respectfully submitted,

s/Stephen W. Grace
Stephen W. Grace (BPR No. 14867)
1019 16th Avenue, South
Nashville, Tennessee 37212
(615) 255-5225


s/Douglas B. Janney III
Douglas B. Janney III (BPR No. 19112)
2002 Richard Jones Road
Suite B-200
Nashville, Tennessee 37215
(615) 742-5900

Attorneys for Plaintiffs


**CERTIFICATE OF SERVICE**

      I certify that I electronically filed and served Plaintiffs' Response to Defendants' Motion in Limine using the Court's CM/ECF system upon King F. Tower and D. Earl Baggett, Williams Mullen, P.C., P.O. Box 1320, Richmond, Virginia 23218-1320 and W. Scott Sims, Walker, Tipps & Malone, 150 Fourth Avenue, North, Suite 2300, Nashville, Tennessee 37219-2515 on January 15, 2010.


                                s/Douglas B. Janney III

11

Case 3:08-cv-01166   Document 90   Filed 01/15/10   Page 11 of 11 PageID #: 2388